Tony Matijevich, a Minor, by Samuel Matijevich, his Next Friend, Appellee, v. Dolese & Shepard Company, Appellant.

## Gen. No. 34,562.

Opinion filed May 13, 1931. Rehearing denied May 26, 1931.

WILLIAM J. PRINGLE and. EDWIN TERWILLIGER, for appellant.

T. P. McCLORY and DENNIS J. TOOLE, for appellee.

MR. JUSTICE FRIEND delivered the opinion of the court.

Tony Matijevich, a minor, by Samuel Matijevich, his next friend, as plaintiff, brought an action on the case in the circuit court of Cook county against Dolese & Shepard Co., defendant, resulting in a verdict and judgment for $3,700, from which this appeal is prosecuted.

The first and second counts of the declaration are substantially the same, and allege that defendant owned unfenced premises readily accessible from adjacent highways and nearby dwellings, on which it was conducting a mine or quarry for the removal of stones, etc., and that there existed on the premises a large and deep hole, partially or entirely filled with

water to the depth of 10 feet; that in the conduct of its business the defendant had located on its premises various derricks, dredges, drilling machinery and other equipment, and also fuses, caps, dynamite and other forms of dangerous and highly explosive material; that all of said machinery and equipment was visible from adjacent highways and from nearby dwellings, and that said premises were so situated and maintained as to be attractive to children of tender years; that for a long time prior to May 30, 1927, children of tender years had been in the habit of resorting to said premises and playing upon and around the same and upon and around the various implements, equipment, machinery and other paraphernalia, and had been in the habit of swimming and diving in said water, attracted and invited thereto by childish curiosity and instinct, and that defendant well knew this but nevertheless negligently suffered the premises to remain unfenced and took no precautions to keep children therefrom or to safeguard them while thereon; that on May 30, 1927, the plaintiff was an infant of the age of 10 years, and while in the exercise of ordinary care for his own safety, and while his parents were in the exercise of ordinary care for his safety, was on the date aforesaid, with the knowledge and consent and at the invitation of the defendant, playing upon the premises, attracted thereto by childish curiosity and instinct; that it was the duty of defendant to properly protect and safeguard plaintiff on the premises, but defendant disregarding its duty failed to take the proper means in this regard and suffered, permitted and allowed plaintiff to go about the premises of his own volition; that by reason of the premises aforesaid and defendant's negligence, plaintiff then and there picked up and handled a certain fuse,

cap or detonator, highly explosive in character, which defendant had carelessly left lying upon and about the premises; that the dangerous character of said fuse, cap or detonator was unknown to plaintiff and that there was nothing on, around or about said fuse, cap or detonator to indicate to a child of tender years its dangerous character; that said fuse, cap or detonator then and there and while in the hands of the plaintiff exploded, by reason whereof the plaintiff's hand was greatly torn and injured.

From the evidence it appears that Dolese & Shepard Co. owned extensive real estate adjacent to the Village of Hodgkins, some 15 of 20 miles west of Chicago; that a portion of this land was an open quarry of elliptical shape about three-quarters of a mile across, north and south, and about half a mile across, east and west; approximately 3,000 feet north of the quarry was Joliet Road running east and west and about 600 to 800 feet west thereof, East End Avenue extended north and south; there are seven or eight houses west of the quarry on East End Avenue, in one of which plaintiff lived.

It further appears that there are several different levels about the quarry, as follows: (1) the surface of the ground previous to the removal of any of the dirt preliminary to quarry operations; (2) the rock surface where the dirt had been scraped off, which was about 8 to 12 feet below the original soil level. Below this rock surface from which the overburden had been removed was what the witnesses called the first level. On this the steam shovels were operating at the time. This level was about 20 or 25 feet below the rock surface. The second level or bottom of the quarry was about 15 to 20 feet below the first level. Along the west side of the quarry between it and the above mentioned residences on East End Avenue a

spoil bank, caused by the removal of dirt from the rock surface, had been piled up, making a hill about 15 to 20 feet higher than the surface of the ground.

The evidence discloses that there were two kinds of blasting operations carried on to break up the stone · for hauling to the crushing plants. The preliminary blasting consisted in drilling extensive holes into the ledge of rock and blasting out a large section of the ledge which by the force of the blasting was broken up into smaller pieces. These were loaded on small cars by steam shovels. The small cars were operated by electric third rail leading to the crushing plant. There was also a secondary system of blasting which consisted of drilling pieces of rock that were too large to be handled by the steam shovel and breaking them up with a small charge of dynamite, which was exploded by a cap and fuse. The defendant kept its general store of dynamite, caps and fuses in a magazine on the surface of the ground distant from the quarry. It kept a small daily supply of dynamite, caps and fuses for secondary blasting in wooden boxes about 10 by 15 inches in size, covered with a piece of tin or sheet iron, weighted down by a rock of 25 to 50 pounds, to protect it from rain and sparks from the steam shovel. The box containers were kept about 100 feet back of the steam shovel. The steam shovel and explosives were located in the northwestern part of the quarry hole on the so-called first level.

It further appears from the evidence that at the southwestern part of the quarry, at a distance of approximately half a mile from the steam shovel and box of explosives, there was a small depression in the rock in which, after a rain, water gathered in a pool about 10 feet across and two or three feet deep, in which several different boys had been seen to wade in the course of several years prior to the accident.

This pool would dry up and disappear after the rainfall. No children had ever been seen anywhere in the quarry except at this puddle of water and none had ever been seen at or near the steam shovel and box of explosives.

On Decoration Day, May 30, 1927, when the quarry was not operating, plaintiff was at home sawing wood, and at the suggestion of an older companion, Johnnie Klanyac, went down in the quarry to hunt frogs. The two boys did not go to swim or wade in the pool. After catching a frog they proceeded down in the quarry toward the steam shovel, where, according to the testimony of plaintiff, there were some caps and fuses lying on the ground outside the wooden box. They picked up two or three of these and also took several tin boxes of caps and some fuses out of the wooden box. The tin boxes of caps were plainly marked in black-faced type on top and on all four sides, "Blasting caps. Dangerous. Handle carefully" together with various warnings such as, "not to drop caps; never to stick wire, matches, etc. into caps."

The evidence further shows that plaintiff had lived near the quarry ever since he was born and heard blasting going on there every day. At the time of the accident he was attending school and could read, and according to his testimony he did in fact read the warnings on the box and knew that the contents of the box were dynamite caps, that they were explosive and would go off with a bang when a match was set to them, that they were dangerous, that the caps belonged to defendant and that it was wrong for him and his companion to take them. Plaintiff's father testified that he had repeatedly warned plaintiff and his other children to keep out of the quarry, and plaintiff himself knew that he had no right to go there.

The evidence discloses that the boys took four boxes of caps to the top of the quarry and proceeded to plaintiff's home, where they procured some matches and hid some of the caps. Thereafter they started to explode the caps by attaching fuses, lighting the fuses with matches, and then running away a safe distance while the caps exploded. Finally after plaintiff had exploded about 12 of the caps in this manner, his companion Johnnie dared him to hold one of them in his fingers and light it with a match. According to his testimony the plaintiff did so because he was dared to do it. The ensuing explosion caused the injury to his fingers which necessitated the amputation of portions of his thumb and three fingers on the left hand.

It is conceded that a landowner owes a trespasser no duty other than not wantonly to injure him. Plaintiff herein was clearly a trespasser, but it is contended that the facts bring this case within the so-called attractive nuisance principle, making it a question of fact for the jury to determine whether or not plaintiff's presence on the premises was at the implied invitation of defendant, by reason of some alluring and dangerous device within the purview of that doctrine.

It is, of course, a well settled rule that infants have no greater right to go upon another's property than adults, and the mere fact that they are infants imposes no duty upon landowners to expect them and prepare for their safety. (*Conlon v. Bailey*, 58 Ill. App. 261.)

The attractive nuisance doctrine affords an exception to this established rule of law, however, and for that reason must be very cautiously applied. Under this doctrine, premises having dangerous attractions are regarded as holding out an implied invitation to children, which will make the owner of the premises liable for injuries to them even though they be trespassers. This doctrine has been accepted in Illinois

with certain definite limitations. One of these is that the *attractiveness* or *allurement* of the dangerous agency, or of other agencies in intimate juxtaposition to it, is of paramount importance in determining the liability. (*McDermott v. Burke*, 256 Ill. 401.) That element is lacking in this case. It is the undisputed evidence that the boys came upon the premises with the predetermined purpose of hunting frogs, and that they were not lured there by the water hole, the machinery in the quarry or the explosive materials which caused the injury.

It is further urged that the act of plaintiff and his companion in taking the dynamite caps constituted larceny, or, at least, an additional trespass, and that this additional trespass was the proximate cause of the injury and bars the action. In this connection it is pointed out that plaintiff was of an age when he would be presumed to know the wrong of taking these caps, even without evidence on that point. Plaintiff himself testified, however, that he knew the caps belonged to defendant and that it was wrong for him to take them. Having become a trespasser on defendant's property, plaintiff committed a second trespass in taking the caps from the receptacle in which they were kept and it was the second trespass that proximately caused his injury. Under these circumstances it would be immaterial whether he was lured to the premises by an attractive nuisance, for he found and was injured by another attraction after entering the quarry.

Numerous cases cited by defendant point out definitely the distinction in law and recognize the limitation thus placed upon the doctrine of attractive nuisances.

In *Donaldson v. Spring Valley Coal Co.*, 175 Ill. App. 224, the court said:

"Having become a voluntary trespasser, he could not become anything else by finding an attraction after he got on the premises. . . . To ask the courts to impose on the owners of such enterprises a duty to save trespassing children from harm, is asking the courts to impose on such owners a duty which the laws of nature and the laws of the land impose on parents."

In *Seymour v. Union Stock Yards*, 224 Ill. 579, plaintiff, a five-year-old-boy, was attracted to defendant's property by a pile of clay. After playing in the clay pile which had attracted him, he ran alongside a moving train under which he accidently fell and was injured. The court held that a directed verdict for defendant was proper on the ground that the proximate cause of the injury was not the pile of clay nor any danger with which the boy was brought in contact while gratifying a curiosity or desire excited by that pile, but that the injury was proximately caused by the movements of the plaintiff in placing his hands on and running alongside of the cars.

In *Anderson v. Karstens*, 218 Ill. App. 285, a five and one-half-year old boy, together with other children, was playing in a vacant lot on which empty gasoline cans had been left. One of the children playing with plaintiff put a lighted match into one of the cans and it exploded. The court held that the proximate cause of the injury was not the maintenance of these cans on the vacant lot where children were wont to play, but that there was an intervening proximate cause, the acts of the other boys in applying matches to the cans.

Other jurisdictions have recognized the limitation upon this doctrine of attractive nuisances in the same manner as our courts. The facts in *Nicolosi v. Clark*, 169 Cal. 746, disclose that plaintiff, a child of 10 years,

took dynamite caps from a tool box on a public street. The complaint alleged that the child was attracted to the caps by childish curiosity. The court held, however, that plaintiff was clearly guilty of trespass, if not peculation, barring his right of recovery.

In *Dudley & Orr v. Hawkins* (Tex. Civ. App.), 183 S. W. 776 plaintiff, a boy of 13, stole powder from a quarry and injured himself when he set it afire. The complaint alleged that he was attracted by the powder, but the court in its opinion said:

"It seems clear that he was not allured there by the powder, for he says that he had not been up to the place where the blasting was done, where he found the powder, before the time that he went up and got it. . . . The plaintiff in this case did not discharge the burden of proof and the appellants did show conclusively that Roscoe did know and appreciate the danger and there was no conflicting evidence. The court should have given appellants' peremptory charge." *Bennett v. Odell Mfg. Co.,* 76 N. H. 180, *Afflick v. Bates,* 21 N. I. 281, and *Mergenthaler v. Kirby,* 79 Md. 182, are to the same effect.

There is, however, another important circumstance disclosed by the evidence in this case. Plaintiff admitted, and it seems to be undisputed, that he held the cap which caused the injury in his hand pursuant to a dare on the part of his companion. Being able to read the legend appearing upon the containers and knowing the caps to be dangerous by reason thereof and also because of his experience in exploding several of them prior to the injury, with the resultant noise and concussion that followed therefrom, plaintiff's conduct showed an absence of due care for his own safety. In fact, his conduct amounted to a reckless disregard to known danger undertaken in a spirit of bravado, and

it is contended that where the evidence is undisputed, as in the case before us, the question of contributory negligence becomes one of law for the court to determine, and that a peremptory instruction in favor of defendant should have been given in this case. While the declaration alleges that plaintiff did not know the dangerous character of the cap and that there was nothing on or about it to indicate its danger, the allegations are not borne out by the evidence. It may be said in fairness to plaintiff that perhaps he did not realize the full extent of the danger he was undertaking, but he certainly knew that he was doing something hazardous, and the fact that the danger proved to be more serious than he anticipated does not make his act, which contributed to cause the accident, any the less negligence on his part. When he accepted his companion's dare he knowingly invited some injury, and under the authorities he cannot make his own negligence the basis of a recovery.

It was so held in *Austin v. Public Service Co.*, 299 Ill. 112. In that case a boy walking an iron beam on a bridge over a river was killed through coming in contact with an electric light wire. The court, in reversing a judgment for error in refusing to instruct the jury to find for the defendant, stated:

"Whether deceased voluntarily touched these wires or involuntarily seized them in an effort to save himself from falling into the river can make no difference, because it was his own negligence that placed him in this place of danger. Deceased had no business on top of this bridge and no person exercising due care would have been there. In view of the record in this case, we are forced to the conclusion that the deceased was not in the exercise of ordinary care for his own safety and that the proximate cause of the injury which re-

sulted in his death was his act in voluntarily placing himself in a place of known danger. Such conclusion is so plain and clear that all reasonable men must arrive thereat from a dispassionate consideration of the evidence in this case. The evidence not only failed to show the exercise of ordinary care, but showed complete want of care.''

In *Johnston v. New Omaha Electric Light Co.,* 78 Neb. 27, the facts disclose that a boy of twelve touched an electric light wire, carelessly left exposed, in a spirit of bravado, knowing that it was dangerous. There was an instructed verdict for the defendant. The court in its opinion said:

''We know of no rule of law to the effect that, when one is negligent in a situation of danger the existence and nature of which he knows, he may nevertheless recover damages because the resulting injury is greater than he anticipated.''

In *State v. Trimble,* 315 Mo. 32, the boy climbed a pole and proceeded out on cables attached thereto about which there was a live wire. He was performing this stunt on a dare. He had not intended to touch the live wire above him, but lost his balance and grabbed it to save himself from falling. Recovery was sought on the attractive nuisance theory, but the court, holding that plaintiff was guilty of contributory negligence as a matter of law, said:

''It was not the attraction of the pole, as maintained but it was the desire to do something unusually hazardous, difficult and heroic and thus appear well in the eyes of the girls, that induced the boy to undertake his reckless and dangerous feat.''

While plaintiff and his companion were exploding caps by inserting fuses, lighting them and then running away until they exploded, they were exercising such

care as prudent children of their age, experience and intelligence usually exercise in firing explosives. He evidently knew and understood that the fuse was intended to provide an element of safety between the time of applying the match and the explosion, and that its purpose was to give him time to get out of danger. It is apparent from the fact and manner in which plaintiff and his companion exploded these caps prior to the injury that they fully understood the purpose of the fuses and knew the difference between due care and the reckless procedure followed in the instance which resulted in the injury. The deliberate departure from that safe and customary way to a more dangerous one because of a dare amounted to an intentional abandonment of the caution which plaintiff evidently knew how to employ and his own act in holding the cap in his hand was the very antithesis of due care and caution for his own safety.

Under facts such as these and in view of the definite limitation placed upon the doctrine of attractive nuisances by the courts of our own and other States, it cannot well be urged that cases involving injuries to children engaged in play and occasioned by a dangerous agency must always be submitted to a jury to determine whether there is an element of attractiveness present. Our Supreme Court, in the case of *Burns v. City of Chicago,* 338 Ill. 89, quotes from the opinion in a recent Minnesota case what seems to us to aptly express the limitation upon this doctrine. They say:

"To the irrepressible spirit of curiosity and intermeddling of the average boy there is no limit to the objects which can be made attractive playthings. In the exercise of his youthful ingenuity he can make a plaything out of almost anything and then so use it as to expose himself to danger. If all this is to be

charged to natural childish instincts and the owners of property are to be required to anticipate and guard against it, the result would be that it would be unsafe for a man to own property, and the duty of the protection of children would be charged upon every member of the community except the parents or the children themselves. *Erickson v. Minneapolis, St. Paul and Sault Ste. Marie R. Co.,* 165 Minn. 106.

The facts in this case make it readily distinguishable from those cited by plaintiff under the attractive nuisance doctrine. Plaintiff was not attracted or lured to the premises by curiosity. He was not only a trespasser, but while wrongfully on the property committed a second trespass that resulted in his injury and he failed to exercise due care and caution for his own safety in the face of a known hazardous act. Regrettable as it is, we are constrained to find from the clear evidence in this case and the weight of authority applicable thereto that the defendant is not liable as a matter of law and that the court should have so instructed the jury.

For the reasons herein stated the judgment of the trial court will be reversed with finding of facts here.

*Reversed with finding of facts.*

WILSON, P. J., and HEBEL, J., concur.

Finding of facts: We find as the facts that the plaintiff was not on the premises at the time of the injury by express or implied invitation of the defendant; that the plaintiff was not lured upon the premises of the defendant by any attractive and dangerous place, device, condition or thing maintained by the defendant; that the plaintiff came upon the defendant's premises for the purpose of hunting frogs and that the plaintiff at the time of his injury was a trespasser on the defendant's premises and the defendant owed the

plaintiff no duty to see to his safety thereon; that the dynamite caps by the explosion of which the plaintiff was injured were plainly marked as dangerous and were known to the plaintiff to be explosive and dangerous; that the plaintiff knowing it was wrong so to do committed a second trespass in taking and carrying away and exploding dynamite caps and that this second trespass and not any negligence on the part of the defendant proximately caused the plaintiff's injury; that the plaintiff was guilty of negligence which contributed to cause his injury and that the defendant is not liable for said injuries.